UNITED STATES v. JACOBSON. See Case No. 15,461.

---

# Case No. 15,461.

## UNITED STATES v. JACOBSON.

[Brun. Col. Cas. 410;[1] 2 N. Y. City H. Rec. 131.]

Circuit Court. D. New York. 1817.

CRIMINAL LAW—INDICTMENT FOR DESTROYING VESSEL.

The master may be indicted for wilfully destroying a vessel with intent to defraud her underwriters. though the owner be on board and consent to or command the destruction of the vessel.

---

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

The prisoner was indicted under two sections of the United States statute (volume 7, p. 126), for sinking the ship Aristides, on a voyage from New Orleans to New York, on the 17th day of June last. The indictment contained thirteen counts, five of which were framed under the first, and eight under the second section. In these last counts the offense was laid as having been committed with an intent to defraud the American Insurance Company of six thousand dollars, the amount of the insurance on the vessel.

Dist. Atty. Fisk and Hoffman & Griffin, for the prosecution.
Mr. Wells, D. B. Ogden, and Mr. Price, for the prisoner.

His honor the judge stated to the jury in his charge that they could not be called together to discharge a more solemn and important duty. From the patience manifested by them throughout this tedious trial he had no doubt they would do their duty on this occasion to the prisoner at the bar and to themselves. At this late hour, so fatigued as the jury must be, his honor said that he should not minutely detail the testimony, nor even refer to more of the prominent facts than his duty required.

The prisoner was indicted under two sections of an act of congress of 1804 [2 Stat. 290]. under the first section as belonging to and being on board, not as owner but as captain, of the ship Aristides, on a voyage from New Orleans to New York, and wilfully and corruptly destroying that ship, or procuring her to be destroyed, she being the property of some citizen or citizens of the United States. The charge against the prisoner under the second section of the statute is that he was the owner in part or whole of the same vessel, and destroyed her on the high seas with an intent to defraud the American Insurance Company, which had underwritten a policy of insurance on the vessel to the amount of six thousand dollars.

The first question for the determination of the jury naturally arising is. whether this vessel was wilfully destroyed; and the second, whether the prisoner at the bar was the author of such destruction. The rule of law referred to by the counsel for the prosecution. that if the prisoner at the bar were aiding. abetting, and assisting in the perpetration of the offense, he is equally guilty with his co-adjutor, is undoubtedly correct. It has been objected by the counsel for the prisoner that the evidence in this case is merely circumstantial. The rule in this court, even in capital cases, is that should the circumstances of a case be sufficient to convince the mind, and remove every rational doubt. the jury is bound to place as much reliance on such circumstances as on direct and positive proof; for facts and circumstances cannot lie. And if in this case the jury should believe, from all the facts and circumstances. that this prisoner was instrumental in the destruction of

this vessel. either solely or in conjunction with others, however painful, it would be an imperious duty to convict him.

A very important circumstance in this cause urged by the counsel for the prosecution is the want of cargo on board this vessel. Should the jury believe this, a strong motive is furnished for the perpetration of the offense charged against the prisoner; and we have a right to interpret this circumstance against him. Had there in truth been a cargo on board, the proof thereof would have been highly important to the prisoner on this occasion; and in the absence of all proof on that subject the jury have a right to infer strongly against him, should they think it was in his power. had such proof existed, to have produced it. Might not the bill or bills of lading of this cargo at least have been produced? If a set were not put on board, or had they been lost. might not another set have been procured at New Orleans? Still the judge said that he did not intend to instruct the jury that the want of a cargo on board this ship was alone conclusive.

It had, in the second place, been strongly urged by the counsel on behalf of the prosecution that the manner in which this vessel was lost, without any apparent reason for such loss, independent of the fraudulent destruction and the conduct of the prisoner immediately preceding the time she was sunk, furnish conclusive evidence that he was either the author, solely or concerned with others, in such destruction. And it is said that all the circumstances attending that transaction show that this vessel might have been run on shore and the freight saved. It had been with much reluctance that the court had proceeded even thus far in the testimony. His honor was aware that in a case involving such a vast variety of facts. a case in which everything had been said that could be, and every argument urged on both sides. by counsel of the first eminence in the country, the jury had long since made up their opinion.

His honor concluded his charge by saying that he forbore giving any opinion on the merits of this cause; but would leave it with the jury on two grounds: (1) Should the jury believe from all the facts and circumstances in the case that there was no cargo on board this vessel; and (2) that with proper exertions she might have been brought on or near the shore by the prisoner, and those under his command—the jury might find him guilty.

The course which the counsel for the prosecution advised with regard to acquitting the prisoner on one set of the counts in the indictment, should he be found guilty on the other, should be pursued by the jury; for he could not be convicted on the indictment generally.

The jury retired at about half after three o'clock in the morning, and a short time before five returned a verdict against the prisoner. on the five counts under the first section of the statute, and acquitted him on the remaining part of the indictment. They recommended him to mercy.

On the 13th day of September, instant, at eleven o'clock in the forenoon, the prisoner was brought to the bar in the presence of a vast number of spectators to receive sentence. The counsel for the prisoner moved the court in arrest of judgment, and the court assigned the time for arguing the motion at one o'clock on the same day.

At this time the counsel for the prisoner in support of this motion assumed the following grounds:—

1. The court has no jurisdiction in this case. The third article of the constitution of the United States, establishing the supreme court of the United States, and providing for the establishment of such inferior courts as congress shall, from time to time, ordain and establish, does not authorize congress to pass a law assigning any justice of that court to hold a circuit or any other inferior court. By the second section of the second article of the constitution the president of the United States, with the advice and consent of the senate, is vested with the power of appointing judges of the supreme court, and all other officers of the United States whose appointments are not therein otherwise provided for, and which shall be appointed by law. The congress having established this court (this court is established by an act of congress of 1802 [2 Stat. 156], dividing the United States into districts, and assigning the justices of the supreme court in their respective districts to hold such circuit courts; 1 Gord. Dig. tit. "Judiciary," p. 264), the judges thereof should have been commissioned by the president in the same manner as the justices of the supreme court.

2. The prisoner had been convicted by the jury on the first five counts in the indictment, charging him as not being the owner of the vessel. The owner, as appeared from the evidence, was on board, and the prisoner acted either in concert with him or under his immediate directions. As the object of the second section of the act was to prevent the practice of frauds upon underwriters. so the object of the first section was to prevent frauds against the owner. But here no fraud had been practiced against the owner because he was on board, and most probably aided in the destruction. The prisoner, therefore. is not guilty of any offense under the act of congress. The counsel in support of this ground mentioned to the court a decision of the supreme court of this state in the case of Philip Spencer, indicted for arson, in burning a mill, under the fifth section of the "act declaring the punishment of certain crimes," wherein it appeared in evidence that the prisoner burnt a mill in concert with the owner for the purpose of defrauding the insurers of the property. On the conviction from the court below being brought into the supreme court, it was decided that the prisoner. having concurred with the owner in the destruction of

the property, had been improperly convicted of arson.

Griffin argued in answer to the first objection relied on by the opposite counsel that the jurisdiction of this court in its present organization had been too long settled to be questioned. The supreme court of the United States had acquiesced in the act of congress, assigning the duties of this court to be performed by the justices of the supreme court. The counsel in support of this branch of his argument cited [Stuart v. Laird] 1 Cranch [5 U. S.] 308.

In answer to the second objection urged the counsel contended that the first section of the statute was general, and was intended by the legislature to embrace every description of persons belonging to the vessel (except the owner) who shall, on the high seas, wilfully and corruptly destroy any vessel. The offense whereof the prisoner is charged comes within the words of the statute, and it is immaterial whether the owner was on board aiding, abetting, and assisting in such destruction or not. Should the construction prevail, for which the opposite counsel contend, then the owner of a vessel to defraud the insurers may combine with the captain and crew, or either of them, and be present, commanding, aiding, and assisting in the destruction of the vessel, and such captain and crew would escape with impunity. This could never have been the intention of the legislature; it would be affording encouragement to the most glaring frauds.

Hoffman said he did not intend to enter into an argument on the construction of this statute, but he would barely suggest if the court had any doubt on the subject that perhaps the better course would be to have the case submitted by his honor the judge to the justices of the supreme court of the United States for their opinion.

His honor said he was fearful if this course should be adopted that much aid would not be derived from the justices of the supreme court. That body would hardly be inclined to interfere or give an opinion in a cause not regularly before them for adjudication. He was inclined to the opinion that the offense of which the prisoner is charged came within the statute. The object of destroying this vessel was to defraud the underwriters, and such object was known to the prisoner. If he either destroyed this vessel, or aided, abetted, and assisted in such destruction, though with the concurrence of the owner, the act was wilful and corrupt, and is embraced within the statute. Had no fraud or mischief been meditated against the underwriters or others by the owner, who intended no injury to any other person but himself, then the destruction of this vessel by the captain, in concert with the owner, would not have been corrupt. In this case as the verdict stands the prisoner was not the owner of this vessel; she was the property of a citizen of the United States, and was destroyed by the prisoner with the intent of defrauding the underwriters on the ship and cargo to a large amount. The principal part of this insurance was on a cargo which was not on board, and that known to the prisoner. This vessel was therefore wilfully and corruptly destroyed, and no command or concurrence of the owner under such circumstances could justify the prisoner.

On the other ground of objection relating to the jurisdiction, the judge said that his private opinion was decidedly in favor of the objection. The act of congress directing the justices of the supreme court of the United States to hold circuit courts was unconstitutional, and not binding on the judges. The supreme court was created by the constitution, and its powers and duties were therein defined. The legislature, therefore, could neither add to the one nor to the other. This precaution was highly proper, as it respected the appellate court of the federal judiciary. If, besides the duties prescribed for it by the constitution, the legislature were at liberty to add to them such others, not only in their own court but in courts with which they had no connection, there would be an end of that independence which should ever exist between co-ordinate branches of the same government; and so long as such power shall continue to be exercised, and be acquiesced in, the supreme court will be kept in a state of dependence on the legislature, which could never have been contemplated by those who framed the constitution. It is a fact that the labor of holding circuit courts has become much more burdensome to the judges of the supreme court than the discharge of their regular, appropriate, and constitutional functions in the court for which they are commissioned. It may be added, for so the fact is, that the business of the supreme court is much impeded by the attention of the judges to their circuit duties, to the very great inconvenience and heavy expense of the suitors therein. Congress have a right to ordain and establish, from time to time, such inferior courts as they may think fit; but they have no power to commission the judges of such courts, nor to appoint any judge by law. If they thought proper, therefore, that a circuit court should consist of a district and another judge, such other judge should have been appointed, as well as the district judge, on the nomination of the president, and by and with the consent of the senate. He should have been commissioned during good behavior, and have received a compensation for his services. But no commissions have ever been granted to the justices of the supreme court constituting them judges of the circuit court, nor have they taken any oath of office as such; and instead of receiving a compensation for these heavy and expensive duties, their salaries as justices of the supreme court have been greatly diminished by them. The inconvenience of the system as it respects the administration

of justice may also tend to show that the constitution in this respect has not been pursued. It could never have been intended that the judges of a court, whose principal duties are of an appellate nature, should ever form a constituent part of those inferior tribunals whose decisions they were to revise. The disadvantages of such a system in practice can hardly be estimated, except by those who have had some experience in them. It is certainly desirable that judges of an appellate court should form no opinion in an inferior tribunal; and· when sitting separately on questions which are to come before them in a court of appeals, or otherwise, the benefit of consultation, so important to a suitor, and of a judgment resulting from such consultation, without any previous bias, will be in a great measure lost. So very inconsistent are these duties that if the president had been left, as he ought to have been, to nominate and commission a judge of the circuit court, it would hardly have occurred to him to offer such commission to a judge of the supreme court; and if he had, and it had been accepted, such judge must certainly have resigned the one which he before held.

It will be seen, also, by the constitution, that the judges of the supreme court have not only a very limited original jurisdiction, but little or none of a criminal nature; and yet the most extensive criminal cognizance, extending even to the capital offenses, is given to them as members of the circuit courts. Now, if congress cannot extend the original jurisdiction of the supreme court beyond the bounds limited by the constitution, and so that court has decided, it is not seen how they can extend the jurisdiction of the several judges of that court to cases over which the court itself has neither original nor appellate jurisdiction; or how, because the constitution and their commissions have made them judges of the supreme court, congress can, without their consent, make them judges of an inferior court. One thing is certain, .that if congress can make them discharge the duties of one inferior court, they can throw into their hands the business of every inferior tribunal that may be established; and, indeed, it is not long since that a bill passed both houses of ·congress assigning, in certain ·cases,· the duties of the district courts to the judges of the supreme court. The president. Mr. Madison, returned the bill with objections, and it did not pass. These objections are not now before me, but as far as they are recollected, they would apply as well to the act under consideration as to the one for which they were made. But it is unnecessary to pursue this inquiry further; for although this be my own opinion, which I have thought it my duty to express, it will be remembered that this question came before the supreme court in 1803, when the judges, waiving any opinion on the constitutionality of this act, were

pleased to consider the practice of a few years under it as precluding all argument on the subject. Whether, if the question shall ever come before that court, it will consider such acquiescence as putting at rest this great constitutional question I cannot say, as it has never received a decision on its merits. It is not yet too late, in my opinion, to review the one which has taken place; but until that be done in its proper place, this court is bound by it, and must suppose, whatever its opinion may be, that it has a right to hold jurisdiction of this case, and to pronounce judgment on the present verdict.

Hereupon the judge, in a discourse of some length, wherein he expatiated on the enormity of the offense of which the prisoner had been convicted, and recommended to him to spend the time allotted to him in this life in preparing for that which was to come. proceeded to pronounce the awful sentence of death; and assigned the time for his execution on the first Friday in March next, between the hours of eleven in the forenoon and one in the afternoon of that day.